Amy **KRENSKI, Respondent–Appellant,**

v.

Richard **AUBUCHON, Appellant,**

**and**

Safeco Insurance Company, Respondent.

**Nos. 60677 and 60679.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 6, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Nov. 5, 1992.

Application to Transfer Denied
Dec. 18, 1992.

Rabbitt, Pitzer & Snodgrass, Daniel T. Rabbitt, Mark A. Kinzie, St. Louis, for Aubuchon.

Wuestling, James & DeVoto, William F. James, St. Louis, for Safeco.

David J. Rauscher, Kathleen L. Rauscher, Clayton, for respondent.

PUDLOWSKI, Judge.

This is a consolidated appeal from judgments arising out of an auto accident. The trial court granted a motion for summary judgment in favor of defendant Safeco (plaintiff's underinsured motorist insurance carrier). The jury returned a verdict in favor of plaintiff Krenski and against defendant Aubuchon. We reverse and remand the summary judgment and affirm the trial court's judgment on the jury verdict.

## I. Background

On August 17, 1988, plaintiff Amy Krenski was involved in a collision with defendant Richard Aubuchon. The accident occurred at the intersection of Heatherton and Greenheath in a residential neighborhood where the speed limit is twenty-five miles per hour. Heatherton is a four lane street running north and south and is approximately forty-two feet wide. It consists of one parking lane and one traveling lane in each direction. Greenheath Street, running east and west, runs into Heatherton at a T-intersection. Greenheath is approximately twenty-four feet wide. There are no traffic signals or signs at the intersection where Greenheath dead-ends into Heatherton.

At approximately 3:00 p.m. on the day of the accident, plaintiff Amy Krenski was driving northbound on Heatherton. Plaintiff made a right turn onto Greenheath, but after proceeding approximately fourteen

feet made a U-turn to head back towards Heatherton. The tight turn made plaintiff's car screech and it died, coming to a stop about four to six feet on Heatherton.

After restarting her car in the intersection, plaintiff saw defendant's truck approximately 225 feet to her left. Plaintiff testified that the truck was heading north on Heatherton at about 45 to 50 miles per hour. Defendant testified that he was only going 25 to 30 miles per hour and that he was within 50 feet of plaintiff when she began her right turn on to Greenheath.

Plaintiff observed that defendant's truck was weaving and crossed the center line into the south bound lanes. Defendant explained that he crossed over to the far curb to avoid a collision. Defendant's truck then came back over into the north bound lanes and hit plaintiff's stopped car. Defendant's right rear wheel well struck the left front bumper area of plaintiff's vehicle and flipped over on its side and came to rest on a lawn. Plaintiff testified she observed defendant's truck for four seconds and had been stopped at the intersection for a total of ten seconds before the collision.

Defendant testified that his truck was loaded with concrete sections torn out of driveways and beer and soda cans for recycling. He further testified that he had consumed no alcoholic beverages on the day of the accident. Three witnesses testified that in their opinion defendant was intoxicated at the scene of the accident. Gregory Krenski, Brigit Baker, and Rose Walsh each stated that they smelled the odor of alcohol at the scene of the accident and that defendant displayed signs of intoxication such as bloodshot eyes, slurred speech, staggering and a nonchalant attitude. The investigating officer, Thomas Argent, testified that there were no indications defendant was intoxicated. However, defendant was not given a breathalyzer or any field sobriety tests because it is standard procedure to dispense with these checks when an injured person, like defendant, is taken to the hospital.

At the time of the accident plaintiff was insured under a policy of insurance purchased by her parents from defendant Safeco. The policy covered three cars, including the car plaintiff was driving. Each vehicle had uninsured-underinsured motorist coverage in the amount of $25,000 per person, $50,000 per accident.

Prior to trial, Defendant Safeco made a motion for summary judgment on the ground that defendant Aubuchon's automobile insurance provided liability coverage in the amount of $25,000 per person, therefore, the underinsured coverage of plaintiff's Safeco policy should not be invoked. The trial court sustained this motion for summary judgment.

Following a jury trial, judgment was entered on June 27, 1991. Plaintiff's total damages were found to be $135,000 with fault assessed at 75 percent to defendant and 25 percent to plaintiff. Therefore, plaintiff was awarded $101,250 with prejudgment interest of $7,016.63 for a total of $108,266.63. Defendant Aubuchon settled his claims for injury and damage with plaintiff's insurance carrier before trial.

## II. Trial Issues

■ Defendant Aubuchon's first point on appeal is that the trial court erred in giving the yield right-of-way jury instruction because it was an incorrect statement of the law and was not supported by the evidence. Although Defendant failed to comply with Rule 84.04(e) by not setting out the relevant instruction in the argument portion of his brief, we will gratuitously examine this point. *See Sewell v. MFA Mutual Ins. Co.*, 597 S.W.2d 284, 290 (1980).

■ The jury instruction at issue contained the language of MAI 14.02 (1978 Revision), which states, "The phrase 'yield the right of way' as used in these instructions means a driver is required to yield to another vehicle which enters the intersection first." This instruction is based on the statutory definition of right-of-way found in § 304.351.1, RSMo 1986. Section 304.-351 codifies the rules of the road regarding right-of-way at intersections. Each subsection addresses a specific category of intersections. Section 304.351.1 applies when there are no traffic controls at an intersec-

tion, and states that the vehicle approaching the intersection shall yield the right-of-way to a vehicle which has entered from a different highway.

Defendant contends that plaintiff did not obtain the right-of-way simply by entering the intersection first. Defendant argues that he had the right-of-way because he was driving on the through street. Defendant maintains that this instruction does not apply to this intersection because an instruction that takes into consideration "the whole circumstances" should have been given.

We disagree with defendant's contentions because neither street has been designated a through highway and the lack of traffic controls denotes this as an intersection falling within § 304.351.1. Under § 304.351.4, through highways are designated by the erection of stop signs or signals at specified entrances thereto.[1] There were no traffic controls on Greenheath that would designate Heatherton as a through highway. Also, the mere fact that Heatherton continues past the intersection with Greenheath does not elevate Heatherton to a through highway at its intersection with Greenheath.

The cases cited by defendant that allow for consideration of the whole circumstances are distinguishable. In *Montgomery v. Petrus*, 307 S.W.2d 24 (Mo.App. 1957), the intersection was controlled by stop signs. In both *Stonefield v. Flynn*, 347 S.W.2d 472 (Mo.App.1961), and *Herr v. Ruprecht*, 331 S.W.2d 642 (Mo.1960) a motorist was attempting to cross a through highway designated as such by a stop sign. Because these cases involve controlled intersections, they are governed by § 304.-351.4, which requires the driver at the stop sign to "yield the right-of-way to any vehicle which has entered the intersection from another highway or which is approaching so closely on the highway as to constitute an immediate hazard during the time when such driver is moving across or within the intersection." This statutory provision encompasses the principle advocated by defendant that the whole circumstances should be taken into account. The statutory scheme of § 304.351, however, clearly creates a different standard for uncontrolled intersections.

Although the intersection in *Haymes v. Swan*, 413 S.W.2d 319 (Mo.App.1967), was not controlled by traffic signals, the court held that the failure to include language in the instruction that allowed for consideration of how a reasonable person would have acted was prejudicial error in a contributory negligence setting. Defendant argues that this case supports the proposition that the right-of-way depends upon all existing circumstances.

Initially, the *Haymes* court stated defendant's duty at an uncontrolled intersection. "If plaintiff's car was the first to reach and enter the intersection, it then became defendant's duty *not* to enter, and if the collision resulted from defendant's breach of this negative duty, such facts alone establish a basis for recovery." *Haymes*, 413 S.W.2d at 325. Also, with the advent of Missouri's comparative fault setting, the jury is now allowed to assess a percentage of the fault to plaintiff. *Gustafson v. Benda*, 661 S.W.2d 11 (Mo.banc 1983). The reasonable person language that the *Haymes* court found lacking has since been dropped from the instruction because the jury is now allowed to consider plaintiff's fault. This, in effect, permits the jury to consider circumstances besides who entered the intersection first.

Defendant had an absolute duty to yield the right-of-way because plaintiff entered the intersection first. This absolute duty does not necessarily result in absolute liability because the plaintiff may still be at fault. The jury, in its assessment of 25% of the fault to plaintiff, properly considered factors that limit her damages. There was sufficient evidence, such

1. Defendant cites *Herr v. Ruprecht*, 331 S.W.2d 642, 648 (Mo.1960), for the proposition that through highways "are designated to handle a great volume of traffic and to move it faster than on intersecting roads." This does not mean that larger roads, by the virtue of being larger, are thereby designated as through highways. Although larger roads tend to be designated through highways, this only happens by the erection of traffic signals on intersecting streets.

as plaintiff's sharp U-turn, to support the jury's assessment of fault to plaintiff.

Defendant further asserts that the facts of this case fall within the ambit of § 304.351.3. That section provides that "[t]he driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard." § 304.351.3.

Defendant's reasoning again assumes that Heatherton was a designated a through highway. Also, the plain wording of § 304.351.3 limits its application to vehicles "approaching from the *opposite* direction." Although defendant argues this is not a mutually exclusive category of intersections, we find that the facts of this case do not fit within any reasonable construction of this language. All the evidence demonstrated that plaintiff had entered first and was stopped in the intersection facing west. She may have been planning to make a left turn, but was stopped there for ten seconds when she was hit by defendant. Defendant had an absolute duty to yield the right-of-way because plaintiff had already entered the intersection. This duty is not obviated by defendant's antecedent negligence in approaching at too high a speed. *Harrellson v. Barks*, 326 S.W.2d 351, 363 (Mo.App.1959).

The statutory scheme of § 304.351 indicates the legislative intent to create different obligations to yield the right-of-way in different situations. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 206 (Mo.banc 1983).[2] The court did not err in giving MAI 14.02. It is the proper instruction for an intersection which is not controlled by traffic signals, *Douglass v. Safire*, 723 S.W.2d 21, 23 (Mo.App.1986), and there was substantial evidence to support the instruction.

Defendant's second point on appeal asserts that the trial court erred in allowing plaintiff's counsel to read the right-of-way statute to the jury. Defendant argues that

this statute was an incorrect statement of the applicable law and that it was prejudicial error to read a domestic statute to the jury.

Plaintiff's counsel read § 304.351.1, RSMo, to the jury after receiving the court's permission. Defendant made no objection at that time. Although this court has no obligation to review allegations of error unpreserved by specific objections, *Bly v. Skaggs Drug Centers, Inc.*, 562 S.W.2d 723, 726 (Mo.App.1978), we will examine it for plain error.

This court recognizes the principle that reading domestic statutes to the jury is improper. *Domijan v. Harp*, 340 S.W.2d 728, 734 (Mo.1960). In *State v. Watson*, 672 S.W.2d 701, 703 (Mo.App. 1984), and cases cited therein, the court held that reading statutes to the jury is reversible error if counsel misstates the law or states it in a manner calculated to mislead the jury. In *Watson*, the statute the prosecutor read misled the jury because it appeared to shift the burden of proof to the defendant. *Id.*

In this case, as discussed above, the statute read to the jury did not misstate the law. The jury then received substantially the same statement of law in MAI 14.02. Nor was the statement read in a manner calculated to mislead the jury. There was no discrepancy in the statements of law or peculiarity in the manner of its reading that could have misled the jury. Although it was improper to read the statute to the jury, no prejudicial error was committed and certainly no miscarriage of justice took place.

In his third point on appeal, defendant contends that the trial court erred in giving instruction number eight which stated that defendant's negligence "directly contributed to cause" plaintiff's damage. Defendant argues that the jury was confused and misled because this instruction was in direct conflict with the instruction concerning defendant's comparative fault.

**2.** In MAI 14.02 (1978 Revision), the notes on use provide, "This definition is intended for use where there is a collision at intersecting high-

ways and there are no traffic controls at the intersection."

Plaintiff's verdict director was modified in accordance with MAI 19.01 (1986 Revision), first alternative, which states, "Third, such negligence directly caused or directly contributed to cause damage to plaintiff." There was no conflict between this instruction and the instruction on plaintiff's comparative fault. MAI 19.01, Notes on Use (1986 Revision), provide, "There is no longer a prohibition against using the first alternate where plaintiff is at fault in light of adoption of pure comparative fault in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983)." [3]

Although inclusion of this same language was considered prejudicially erroneous in *Marsh v. Heerlein*, 299 S.W.2d 441 (Mo.1957), that case was decided under contributory negligence principles. The phrase "directly contributing to cause" was misleading to the jury in a contributory negligence setting when there was only one defendant because it would permit the jury to find for the plaintiff even if they believed plaintiff drove negligently. *Id.* at 444. Today's comparative fault system is not an outright bar to plaintiff's claim. Including this phrase, therefore, is consistent with the comparative fault instruction because plaintiff is allowed to recover even if plaintiff drove negligently. This phrase was not misleading, nor was there any evidence of the jury's confusion. The trial court did not err in allowing this phrase in plaintiff's verdict directing instruction.

Defendant argues, in his fourth point on appeal, that the trial court erred in allowing into evidence the opinion testimony of Gregory Krenski, Brigit Baker, and Rose Walsh that Defendant had been drinking. Defendant maintains that this opinion testimony was without foundation because plaintiff failed to introduce any evidence of erratic driving by appellant.

Gregory Krenski testified that defendant smelled of alcohol, was flushed, slurred his speech, and had bloodshot eyes. He also stated that defendant was unsteady on his feet and had a nonchalant attitude like nothing serious had occurred. Rose Walsh similarly testified that she smelled alcohol and observed the defendant walking slow and wobbly. She stated defendant's speech was slow and slurred and his eyes were red. Brigit Baker testified to these same facts and further stated that she was familiar with signs of intoxication because she had grown up in and out of family owned bars. Finally, all three witnesses gave the opinion that defendant was intoxicated. No one testified that they saw him drinking. All of these facts are circumstantial and opinion evidence of defendant's intoxication based on the witness' observation of defendant's conduct and appearance at the scene of the accident.

Plaintiff, as the proponent of the evidence relating to defendant's intoxication, is entitled to have the evidence construed in her favor on the issue of admissibility. *Jones v. Freese*, 743 S.W.2d 454, 456 (Mo.App.1987). In a recent decision by this court in *Parry v. Staddon*, 769 S.W.2d 811, 813 (Mo.App.1989) we cited *Doisy v. Edwards*, 398 S.W.2d 846, 849 (Mo.1966) for the proposition that evidence of a motorist's drinking or intoxication will be admitted if coupled with other evidence tending to show either erratic driving or that defendant had an impaired physical condition at the time of the accident.

Plaintiff's foundational evidence consists of several facts. Defendant was driving forty-five to fifty miles per hour where the speed limit was twenty-five. He drove into the oncoming lane of traffic to the far curb and then swerved back onto the proper side of the road. Finally, he crossed over into the parking lane and struck plaintiff's stationary vehicle. This evidence was sufficient that a jury could infer that defendant had an impaired physical condition at the time of the collision. Thus, the intoxication testimony was properly admitted.

Defendant's fifth point on appeal asserts that the trial court erred in allowing plaintiff's counsel to state during closing argument that defendant concealed his medical

---

**3.** In contradistinction the Notes on Use from an earlier revision to MAI 19.01, concerning this same language cautioned, "The first alternate should not be used where plaintiff's *contributory negligence* is in issue." (1981 Revision) (emphasis added).

records by not filing a counter-claim and that such concealment implied that defendant was intoxicated at the scene of the accident. Defendant claims that because plaintiff's counsel knew that defendant had settled his claim with plaintiff's insurance carrier and was prohibited from filing a counter-claim, that any argument to the contrary constituted a fraudulent statement and an adverse inference and was prejudicially erroneous.

Plaintiff's counsel made the following statement during closing rebuttal argument:

And it was interesting, Mr. Kinzie [defense counsel] raised the issue of intoxication. Now, what is the best evidence of that issue. What could they have done to show you here that he was not intoxicated. Well, he went to the hospital. They could have brought in his medical records and read them. I cannot get those because he has not filed a counter-claim for personal injuries. I am not allowed to get those records. But they could have and they could have brought those in Court and they could have read those to you.

Defendant did not object to this argument at trial. A motion for a new trial may not be used to raise objections that should have been made during the trial and objections are not timely presented when they are raised for the first time in a motion for a new trial. *Spalding v. Monat*, 650 S.W.2d 629, 631 (Mo.App.1981). When no objection is made to improper arguments, there is nothing for review on appeal, and the failure to request the court to instruct the jury to disregard an improper argument also constitutes a waiver of the right to complain on appeal that the jury was not so instructed. *Hodges v. Johnson*, 417 S.W.2d 685, 689 (Mo.App.1967).

Defendant's argues that the court should undertake a plain error review even though the point on appeal is deficient in that it omits this standard of review. *See* Rule 84.04(d). Plain error is not a doctrine available to revive issues already abandoned by trial strategy or oversight, *Sherpy v. Bilyeu*, 608 S.W.2d 521, 524 (Mo.App. 1980), however, in our discretion we reviewed plaintiff's claim. Rule 84.13(d).

We find no miscarriage of justice or manifest injustice in the trial court allowing plaintiff's reference to defendant's not bringing in his medical records. In *Kennedy v. Tallent*, 492 S.W.2d 33 (Mo. App.1973), the court allowed reference to the absence of a counter-claim when the only reason for the reference was to show the accident was the fault of the defendant. Although this was "totally improper," the court refused to grant a new trial because the argument did not appear to be "so inflammatory or prejudicial as to have affected the result of the trial of the case on its merits." *Id.* at 38. In *Calvin v. Jewish Hospital*, 746 S.W.2d 602 (Mo.App.1988), defendant objected to plaintiff's arguing of an adverse inference from a witness not testifying. The *Calvin* court's finding of manifest injustice is distinguishable. In that case, manifest injustice occurred because plaintiff's attorney was allowed repeated references, over defendant's objection, to a witness' failure to testify when that same attorney's motion to exclude the witness was granted. *Id.* at 605. In this case, there was only a single allusion in rebuttal to defendant's argument that defendant was not intoxicated. This reference was not so inflammatory or prejudicial to have affected the outcome. Point denied.

### III. Insurance Issues

Plaintiff's insurance policy with defendant Safeco contains a face sheet that lists plaintiff's coverage amounts, including the uninsured-underinsured motorist coverage of $25,000 per person, $50,000 per accident. The policy also includes an endorsement entitled "Amendment of Policy Provisions—Missouri." On page 2 of this endorsement is the amendment for the policy section labeled "Damages for Bodily Injury Caused by Uninsured Motor Vehicles," which reads:

It is agreed:

A. With respect to such insurance as is afforded by the policy for damages because of bodily injury caused by accident and arising out of the ownership, maintenance or use of an uninsured motor vehicle, the first subdivision, designated (a),

of *the definition of "uninsured motor vehicle" is amended to include "underinsured motor vehicle,"* subject to the following provisions:

1. Limits of Liability

The following is added to the Limits of Liability provision:

with respect to *underinsured motor vehicles,* the total limit of the company's liability for all damages because of bodily injury as the result of any one accident arising out of the ownership, maintenance or use of underinsured motor vehicles shall be the limits of liability stated in the policy declarations for underinsured motorists coverage, less the sum of the limits of liability under all bodily injury bonds and insurance policies (other than this policy) applicable at the time of the accident. This is the most the company will pay regardless of the number of persons insured, claims made, vehicles or premiums shown in the declarations, or vehicles involved in the accident. If more than one motor vehicle is insured on this policy, or if more than one policy issued to the insured applies to the same accident, *the limits applicable to underinsured motorists coverage may not be stacked.*

2. Definitions:

When used in reference to this insurance (including this and other endorsements forming a part of the policy):

*"underinsured motor vehicle"* means a motor vehicle with respect to the ownership, maintenance or use of which the sum of the limits of liability under all other bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the applicable limits of liability for underinsured motorists coverage under this insurance:

\* \* \* \* \* \*

4. Underinsured motor vehicles coverage shall be *excess* over all bodily injury bonds and insurance policies applicable at the time of the accident.

(bold in original, underline added). This lengthy quotation forms the basis of Plaintiff's claim that the trial court erred in granting Safeco's motion for summary judgment.

Rule 74.04 authorizes summary judgment only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. *Elliott v. Harris,* 423 S.W.2d 831, 835 (Mo. banc 1968). This court must examine the record in the light most favorable to the party against whom judgment was rendered. *Gast v. Ebert,* 739 S.W.2d 545, 546 (Mo. banc 1987). No factual dispute is present as both parties agree plaintiff was covered by a Safeco insurance policy. The issue concerns the extent of coverage.

Plaintiff contends that Safeco was not entitled to judgment as a matter of law because Safeco's policy of insurance was ambiguous. According to plaintiff, this ambiguity arises because Safeco provided more than one definition of underinsured motor vehicle and classified underinsured motor vehicle coverage as part of uninsured motor vehicle coverage. Plaintiff also asserts that the policy is ambiguous because the limit of liability clause of the policy is irreconcilable with the excess insurance clause of subsection four. Lastly, plaintiff seeks to have the policy interpreted in light of the reasonable expectations of the insured.

If a policy is unambiguous, it will be enforced as written absent a statute or public policy requiring coverage. *Hempen v. State Farm Mut. Ins. Co.,* 687 S.W.2d 894 (Mo. banc 1985). If the provisions of a policy are ambiguous, they will be construed against the insurer. *Behr v. Blue Cross Hospital Services, Inc.,* 715 S.W.2d 251, 255 (Mo. banc 1986).

An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract. *Nixon v. Life Investors Ins. Co.,* 675 S.W.2d 676, 679 (Mo.App.1984). If there is a conflict between a technical definition within a contract, and the meaning which would reasonably be understood by the average lay person, a lay person's definition will be applied unless it plainly appears that the technical meaning is intended. *Robin v. Blue Cross Hospital Services, Inc.,* 637 S.W.2d 695, 698 (Mo. banc 1982). The reasons for these rules of con-

struction are that insurance is designed to furnish, not defeat, protection to the insured and the insurance company is in the best position to remove ambiguity from a contract. *Krombach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo. banc 1992).

Many cases have examined for ambiguity the underinsurance provisions of automobile insurance policies. *See Diehl v. Valley Forge Ins. Co.*, 810 S.W.2d 670 (Mo. App.1991); *Geneser v. State Farm Mut. Ins. Co.*, 787 S.W.2d 288 (Mo.App.1989); *Cook v. Pedigo*, 714 S.W.2d 949 (Mo.App. 1986); *Bergtholdt v. Farmers Ins. Co.*, 691 S.W.2d 357 (Mo.App.1985). As recognized by the court in *Maxon v. Farmers Ins. Co., Inc.*, 791 S.W.2d 437, 439 (Mo.App.1990), the latest twist in the factual variations comes in cases where the policy language treats an underinsured tortfeasor the same as an uninsured tortfeasor, but later in the policy there is language that prohibits stacking of coverages.

In *Krombach v. Mayflower Ins. Co., Ltd.*, 785 S.W.2d 728, 729 (Mo.App.1990) (hereinafter *Krombach I*), the policy contained a provision that read: "[t]he term 'uninsured motor vehicle' also includes an underinsured vehicle." That policy, however did not define the term underinsured. The court found that the lack of this definition alone created an ambiguity that should be construed in favor of insureds. *Id.* at 734. The Missouri Supreme Court granted transfer of *Krombach* to decide how the set-off for recovery should be calculated. *Krombach v. Mayflower Ins. Co. Ltd.*, 827 S.W.2d 208 (Mo. banc 1992) (hereinafter *Krombach II*). The *Krombach II* Court pointed out that the Mayflower policy used confusing, duplicitous language, that could have been stated in plain and unequivocal terms, when describing the "amounts payable" by which the coverage limits were reduced. *Id.* at 211. The court construed the ambiguity in favor of coverage and subtracted "amounts payable" from total damage instead of from the limits of underinsured coverage. *Id.* In *Maxon*, the definition of "uninsured motor vehicle" included a phrase describing underinsurance. 791 S.W.2d at 438. The *Maxon* court, noting the similarities to *Krombach I*, allowed stacking of the policies because it treated

underinsured coverage the same as uninsured coverage. *Id.*

The Missouri Supreme Court also addressed this issue in *Rodriguez v. General Accident Ins. Co.*, 808 S.W.2d 379 (Mo. banc 1991). General Accident amended its policies with an endorsement that separately defined underinsured motor vehicles. The *Rodriguez* court refused to interpret the policy in accordance with the objective reasonable expectation of the insured's because the policy was not ambiguous. *Id.* at 383. Stacking was not allowed because there were no statutory requirements in Missouri for underinsured motorist coverage that would have prohibited the anti-stacking provisions as a matter of public policy and because the policy did not treat underinsured coverage as uninsured coverage. *Id.* at 383.

Plaintiff argues that this case is analogous to *Krombach I & II* and *Maxon* while Safeco maintains that *Rodriguez* is controlling. Admittedly, this case falls somewhere in between because it contains similarities to both lines of cases. The similarities to *Krombach I & II* and *Maxon*, that render this policy susceptible to an ambiguity attack is the fact that uninsured coverage "includes" a definition of underinsurance. Also, the policy language could confuse the average lay person because it purports to expand the definition of uninsured motor vehicles but later in the policy restricts this coverage by a further definition of underinsured motor vehicle. On the other hand, there is a definition of underinsurance, labeled as such, and set out separately in a definition subsection of the uninsured motor vehicles coverage section.

The main distinction from *Rodriguez* is that, in that case, the underinsurance definition was not included within the uninsured coverage section. In this case, the underinsurance definition was included within the uninsured coverage section. This fact alone does not create an ambiguity because the policy defines and treats underinsurance coverage different from the uninsured coverage. Although the form of these coverages could have been drafted into separate sections, their sub-

stance provides one coverage for the uninsured motorist situation and another coverage for an underinsured motorist situation.

Plaintiff also asserts that subsection four is inconsistent with the liability limits contained in subsection one. Subsection four provides that underinsured coverage "shall be excess over all" insurance policies at the time of the accident. Reading this clause in conjunction with the operative provisions of the limits of liability subsection, an ambiguity arises. An average lay person could be left with the impression that coverage is provided over and above that furnished by the tortfeasor's insurance.[4] The method for calculating Safeco's limit of liability in subsection one is in conflict with subsection four because it states that the tortfeasor's liability coverage must be subtracted from plaintiff's underinsured coverage to determine whether any amount is recoverable. These clauses do not state in plain, unequivocal terms how the amount recoverable would be determined. In light of *Krombach II*, where the policy contained a similar ambiguity, 827 S.W.2d at 211, we find this policy ambiguous.

The confusion created by this ambiguity requires construction in favor of coverage. "Insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion." *Gaunt v. John Hancock Mutual Life Ins. Co.*, 160 F.2d 599, 602 (2d Cir.1947) (Learned Hand, J.). Interpreting these provisions in favor of the insured's reasonable expectation results in recovery for the full amount of plaintiff's underinsured coverage.

 *Krombach II* extended the public policy that invalidated anti-stacking provisions of uninsured motorist coverage to apply to underinsured motorist coverage. *Krombach II*, 827 S.W.2d at 212. The *Krombach II* court limited the invalidation of anti-stacking provisions, however, to instances where the uninsured coverage and the underinsured coverages are treated the

same or as one coverage in the insurance contract. *Id.* Because we found that this policy treats the coverages separately, the anti-stacking provision will be given effect and the policies may not be stacked. The trial verdict is affirmed and the motion for summary judgment is reversed and remanded. The trial court is ordered to enter judgment in favor of plaintiff and against Safeco in the sum of $25,000.

CRANDALL, P.J., and GRIMM, J., concur.

---

4. For example, assume a plaintiff has $25,000 uninsured-underinsured coverage, tortfeasor has $25,000 liability coverage and that damages are at least $50,000. After reading subsection four, plaintiff could reasonably believe that his $25,000 underinsured coverage would apply to the remaining or excess $25,000 in damages after receiving $25,000 from tortfeasor's insurer.