Marjorie CLOSSON, Respondent,

v.

MIDWEST DIVISION IRHC,
LLC, Appellant.

No. WD 67883.

Missouri Court of Appeals,
Western District.

June 24, 2008.

William E. Quirk, Christopher J. Molzen, Co-counsel, Kansas City, MO, for appellant.

Christopher R. Miller, Daniel Thomas, Independence, MO, for respondent.

Before PAUL M. SPINDEN, Presiding Judge, JAMES M. SMART, JR., Judge and JOSEPH M. ELLIS, Judge.

JOSEPH M. ELLIS, Judge.

Midwest Division—IRHC, LLC d/b/a Independence Regional Health Center ("Midwest" or "IRHC") appeals a judgment awarding Respondent Marjorie Closson $480,000 for injuries sustained as a result of a fall on Midwest's premises. For the following reasons, we affirm.

On October 6, 2003, Mrs. Closson, who was 80 years old, arrived at IRHC for a rehabilitation appointment to treat pain in her leg from an ulcer. There was a non-slip, epoxy-coated ramp that rose approximately two inches in elevation leading from the outside parking lot area to the exterior door of the foyer. As Mrs. Closson was entering from the ramp into the exterior door of the foyer, she tripped and fell, breaking her pelvis and hip. She was immediately taken to the emergency room for treatment.

Michael Turpin, who acted as a liaison between IRHC and patients, spoke with Mrs. Closson shortly after the incident and prepared a Patient Grievance Form. Mrs. Closson alleged that there was an uneven surface, or "jagged edge," where the ramp led from the parking lot into the foyer and that this deformity caused her to trip and fall. Mr. Turpin directed Kevin Fetters, IRHC's director of engineering who was in charge of maintenance and repairs, to investigate. Mr. Fetters investigated the area, discussed his results with Mr. Turpin, and made a notation on the Patient Grievance Form in the "Results of Investigation" section. On December 4, 2003,

after speaking with Mr. Fetters, Mr. Turpin wrote a letter to Mrs. Closson concerning the results of the investigation, among other things. The contents of Mr. Turpin's letter and Mr. Fetters's notation will be discussed in further detail below.

After receiving the December 4, 2003 letter, Mrs. Closson filed suit against Midwest, claiming that it was negligent in maintaining the area where she fell by allowing an unreasonable surface or obstacle to be present and that the unreasonably dangerous condition caused her to trip and fall. Midwest countered that the area was not unreasonably dangerous and that Mrs. Closson only fell because she failed to exercise ordinary care to keep a lookout or pick up her feet to account for any imperfection in the floor surface.

The case was tried to a jury in the Circuit Court of Jackson County over the course of five days. The jury returned a verdict of $1,200,000 and attributed 60% of the fault to Mrs. Closson, resulting in an award of $480,000. The court subsequently entered its judgment in accordance with the jury's verdict. Midwest filed a timely motion for new trial, judgment notwithstanding the verdict, or remittitur, which the court denied. This appeal follows.

In its first point, Midwest asserts that the trial court erred in admitting into evidence the December 4, 2003 letter to Mrs. Closson. In pertinent part, the letter stated as follows:

> Kevin Fetters, Director of Plant Operations at Independence Regional Health Center completed a thorough investigation regarding the environmental safety of the newly installed surface on October 10, 2003. The results of our investigation indicated, that where the new surface joined the old surface there was

minimal cracking, leaving a jagged edge, which may have contributed to your fall. It is noted that on October 11, 2003, repairs were made to prevent any further trip hazards.

Midwest argues that the letter contained inadmissible hearsay and that Mrs. Closson failed to establish that the letter falls within an exception to the hearsay rule. It contends that it was prejudiced by the admission of the letter because the letter contained the sole proof of the essential element of Mrs. Closson's claim that the floor contained a defect, namely a "jagged edge." Midwest insists that the letter's use of the phrase "jagged edge" was prejudicial because no other witness used the phrase "jagged edge" to describe the area where Mrs. Closson fell.

■ Mrs. Closson does not dispute that the letter contains hearsay because it was offered as proof of the statement that "where the new surface joined the old surface there was minimal cracking, leaving a jagged edge, which may have contributed to [her] fall."[1] However, Mrs. Closson argues that she laid a sufficient foundation to show that the letter was admissible as an admission of a party-opponent. She also asserts that Midwest was not prejudiced by the admission of the letter because other evidence was presented that there was a hazardous condition in the area where she fell, whether described as a "jagged edge" or otherwise.

■ Appellate review of a trial court's decisions concerning admissibility of evidence is for abuse of discretion. *United Missouri Bank, N.A. v. City of Grandview,* 179 S.W.3d 362, 371 (Mo.App. W.D. 2005). "We review matters involving admission of evidence for prejudice, not mere error, and we will reverse only if the de-

---

1. "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in that statement." *Doe v. McFarlane,* 207 S.W.3d 52, 72 (Mo.App. E.D.2006).

fendant demonstrates that the error was so prejudicial that it deprived him of a fair trial." *State v. Hudson,* 230 S.W.3d 665, 668 (Mo.App. E.D.2007).

■ Midwest strenuously asserts that Mrs. Closson did not lay a sufficient foundation for the admission of the letter. In response, Mrs. Closson devotes much effort trying to demonstrate otherwise, including her contention that additional information provided after the letter was admitted cured any foundational problems.[2] After a thorough review of the record, however, we conclude that we need not address the propriety of the admission of the letter because it is readily apparent that no prejudice could have resulted from its admission.

As noted above, Midwest objected to admission of the letter because there was no evidence that Mr. Turpin had firsthand knowledge of the investigation. It also insists that the use of the phrase "jagged edge" in the letter resulted in prejudice because no one (other than Mrs. Closson, presumably) characterized the area where Mrs. Closson fell in that manner. This assertion is without merit because Mr. Fetters testified in detail as to the results of his investigation, which were summarized in the December 4, 2003 letter, and to the meaning of the phrase "jagged edge."

When Mrs. Closson's counsel asked, "Is this the outside where the outside concrete meets the inside epoxy, this little, *jagged line* right here?" (emphasis added), Mr. Fetters responded, "It's right there under the door, yes." He conceded that "[i]t does appear that there's some cracking" where the concrete meets the epoxy, as stated in the letter. However, he did not agree that "there's a lip there" and insisted that it was "a very level transition from one surface to the other" and that "those surfaces are still flush and level." He explained that "[t]hose cracks are linear across that where the two surfaces meet. It happens from expansion and contraction." He later stated, "[T]hat line is sloppy. It meanders. The surface was level, but it meanders. And I thought it aesthetically looked poor. So, when we put that ramp in [after Mrs. Closson's fall], I asked them to be sure to clean that line up." Mr. Fetters reiterated these explanations when Midwest's counsel specifically sought and received an explanation of the term "jagged," stating:

> If you look at this edge, it is just crooked, uneven, where those two surfaces meet. I believe that I told [Mrs. Closson's counsel] that upon my investigation, that surface was uneven. Vertically—it was not horizontal. It was not an elevation change. It was simply, when they feathered that material out onto that existing ramp, they did so,

2. Prior to requesting admission of the letter, Mrs. Closson merely read portions from Mr. Turpin's deposition indicating that he was employed by IRHC currently and at the time of her fall, that he recognized the letter, and that his signature was at the end of the letter. After the letter was admitted, Mrs. Closson read additional excerpts from Mr. Turpin's deposition indicating that his duties as "patient representative" at the time of the fall were to "interact with the patients in the facility as kind of a liaison-type person ... [b]etween the patient and the hospital." Mr. Fetters later testified that Mr. Turpin was a

"patient advocate" and that "complaints initially go to the patient advocate and patient representative," who "would notify whoever might be involved in that particular complaint or grievance. In this case, since it was an environmental issue that was alleged, we— [Mr. Turpin] notified me by phone that you might want to take a look at this." He stated that he and Mr. Turpin discussed "what I had done up there, what I had written here and if he needed any further explanation" at some point. He also stated that Mr. Turpin never suggested that he had personally investigated the incident.

rightfully, to eliminate any potential trip hazards there. It went from the thickest portion to the thinnest portion. They feathered it out to make a smooth transition. In doing so and going into that existing asphalt surface, it left what is a crooked line across there.... They were very level surfaces to each other.

There was also additional evidence concerning the condition of the floor and whether there were any "trip hazards." As noted above, Mr. Turpin prepared a Patient Grievance Form with Mr. Fetters's help several days after the incident. The Patient Grievance Form stated, in pertinent part, that "Patient and Patient's Spouse; Richard Closson, both states [*sic*] that Ms. Closson tripped over uneven and jagged payment [*sic*] while she was entering thru the 1st glass doorway by the Pre-registration area." Under the "Results of Investigation" section at the end of the form, there was a handwritten note signed by Kevin Fetters, which stated: "Repaired chipped epoxy coating at doorway and have scheduled the replacement of the ramp approach to the doorway for Saturday, October 11, 2003. This should eliminate any further trip hazards."

Mr. Fetters testified as to his notations on the Patient Grievance Form. In his deposition, he stated, "[H]onestly I did not see what I felt was a hazard. As I looked at the area, I didn't see anything that was major deviations in elevation changes or anything like that, you know, really jumped out at me as something that was hazardous." He stated that when he wrote "chipped epoxy," he was referring to "[t]he epoxy coating that we repaired in that span of work from August to the first part of September, we went in and resurfaced this area. This area had worn and dirty spots in the epoxy, and those were the repairs that were made." At trial, Mr. Fetters admitted that he wrote on the

form that repairing the chipped epoxy coating and replacing the ramp "should eliminate any further trip hazards," but he refused to acknowledge that there actually was a trip hazard. He again stated that he "never honestly saw a trip hazard in this area in my investigation." He testified that he wrote that phrase because he "was responding to what was in the document," which "claim[ed] that there were trip hazards." He later stated that when he wrote "further trip hazards," he was referring to the "potential trip hazards that could have come had this been left exposed to the weather" and that, in his opinion, he "eliminate[d] the possibility that anything could ever develop into a trip hazard."

Mrs. Closson also introduced an "Incident Report," which Officer Richard Shutt, an IRHC security officer who spoke with Mrs. Closson within minutes of the fall, prepared shortly after the fall occurred. In pertinent part, the Report states as follows: "Ms. Closson stated she fell [*sic*] as she was entering the exterior entrance door.... [In the emergency room,] Ms. Closson stated as she was coming through the outpatient entrance door she tripped on the beveled surface at the pavement of the entranceway...." Officer Shutt confirmed these statements in his deposition and at trial. He also explained that "beveled" was Mrs. Closson's word to describe the floor, not his.

Officer Shutt also took pictures of the area where Mrs. Closson fell, which were admitted into evidence. He testified in his deposition that, from his observation of the pictures, "the interior surface was slightly elevated above the outside surface." He explained that the elevation between the foyer and the outside is "so slight it really didn't come to my attention until the accident, the incident, and then I took the picture and then in my report it says

that—Mrs. Closson stated she tripped on the beveled surface of the pavement coming into the door." He stated that where the "decorative surface meets the outside surface ... it's not completely straight across, and there is a slight difference between the—this area here and slightly lower area here." Officer Shutt testified at trial that he did not see anything in the condition of the floor where Mrs. Closson fell "that might have obstructed her direction of travel," either when he was first there after the fall or when he took the photograph.

From this evidentiary summary, it is apparent that ample evidence was presented concerning the condition of the floor and the meaning of "jagged edge" to enable the jury to decide whether the floor contained a hazardous defect. The December 4, 2003 letter merely summarized a small portion of that evidence and was redundant. Moreover, Midwest even referred to the floor as having an "irregular edge" and essentially conceded that the floor was not level in closing arguments. Counsel argued that the area was not unreasonably dangerous because Mrs. Closson "needed to pick up her foot, pick it up, at most an eighth, a quarter of an inch, and put it over on to the next surface." Accordingly, no prejudice could have resulted from admission of the letter. Point denied.

■ In Point II, Midwest claims that, even if the trial court did not err in admitting the December 4, 2003 letter with the phrase "jagged edge," the court erred in submitting Mrs. Closson's verdict director incorporating that phrase. Midwest argues that the verdict director improperly included evidentiary detail from the letter and was prejudicial because it placed undue emphasis on Mrs. Closson's characterization of the floor as having a "jagged edge."

■ "When reviewing claimed instructional error, this court views the evidence most favorably to the instruction, disregards contrary evidence, and reverses where the party challenging the instruction shows that the instruction misdirected, misled, or confused the jury, and there is a substantial indication of prejudice." *Kearbey v. Wichita Southeast Kansas,* 240 S.W.3d 175, 181 (Mo.App. W.D.2007). For the same reasons discussed in Point I, *supra,* Midwest fails to show prejudice. Point denied.

■ Midwest claims in its third point that the trial court abused its discretion in admitting the testimony of Dr. Steven Simon, Mrs. Closson's causation expert, that Mrs. Closson's prior balance problems did not contribute to her fall on October 6, 2003.[3] Midwest contends that this testimony is a change in opinion on causation that was not disclosed before trial as required under the rules of discovery and that it constitutes unfair surprise. It further contends that the testimony was prejudicial because it contradicted the opinions of Midwest's experts that the fall was a result of Mrs. Closson's preexisting balance problems and because Midwest was unable to adjust its questioning of its experts because they testified by videotaped deposition.

While it is doubtful that Dr. Simon's testimony was actually a "change in opinion," we need not address the issue because, as in Points I and II, Midwest fails to show prejudice. Midwest insists that the jury's assessment of 60% fault to Mrs.

---

**3.** Mrs. Closson argues that Midwest failed to preserve this issue for appellate review because it did not make sufficient objections at trial and its brief fails to comply with Rule 84.04 in several respects. We disagree.

Closson does not show a lack of prejudice. It relies on *Gipson v. Target Stores, Inc.*, 630 S.W.2d 107, 111 (Mo.App. E.D.1981), for the proposition that "the mere size of a verdict does not establish that it was the result of bias or prejudice." However, *Gipson* focused on whether the amount of the verdict was excessive and did not even address the apportionment of fault. *Id.*

In the case at bar, the defense's strategy was to show that any imperfections in the floor surface were not unreasonably dangerous and that Mrs. Closson fell only because she failed to use ordinary care and shuffled her feet due to her preexisting walking and balance problems. This was the only basis upon which the jury could have found Mrs. Closson at fault. Thus, it is clear that the jury did not believe Dr. Simon's testimony that Mrs. Closson's prior balance problems did not contribute to her fall. Moreover, Dr. Simon admitted that Mrs. Closson "had some difficulty walking" at the time of the fall, although he attributed it to pain from an ulcer on her leg for which she was going to physical therapy at the time of the accident. Point III is denied.

In its fourth and final point, Midwest contends that the trial court erred in submitting Mrs. Closson's verdict director with language instructing the jury to assess a percentage of fault to Midwest if it found that Midwest's actions "directly caused or contributed to cause damage" to Mrs. Closson. Midwest asserts that the instruction should have read "directly caused damage" to Mrs. Closson.

■■■ "Our review of whether the jury was properly instructed is a question of law and is to be determined on the record with little deference given to the trial court's decision." *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 120 (Mo.App. W.D.2006) (internal quotation omitted). "Jury instructions must be supported by substantial evidence," and "we review the evidence and inferences in a light most favorable to the submission of the instruction, disregarding all contrary evidence and inferences." *Wright v. Barr*, 62 S.W.3d 509, 526 (Mo.App. W.D.2001). "Instructions given must be in compliance with MAI if one exists that is applicable to a particular case." *Thompson*, 207 S.W.3d at 125 (citing *Rule 70.02(a)* ). " 'The verdict is reversed if the offending instruction misdirected, misled, or confused the jury, resulting in prejudicial error.' " *Id.* (quoting *Harvey v. Washington*, 95 S.W.3d 93, 97 (Mo. banc 2003)).

Mrs. Closson's verdict director was based on MAI 22.03 ("Invitee Injured"), as modified by MAI 19.01 ("Verdict Directing Modification—Multiple Causes of Damage") and MAI 37.01 ("Comparative Fault—Verdict Directing Modification"). Midwest objects to the modification pursuant to MAI 19.01. It argues that a modification under MAI 19.01 is improper unless the plaintiff alleges aggravation of a preexisting injury, multiple tortfeasors, an independent intervening cause, or multiple causes of action, none of which it claims are present here. It further argues that comparative fault is insufficient in this case to warrant an MAI 19.01 modification because Mrs. Closson did not "allege multiple causes of damage" or, in other words, that her preexisting balance problems contributed to cause her fall. Midwest insists that because Mrs. Closson's sole theory at trial was that Midwest's negligence caused her to fall, the modification improperly lowered her burden of proof on causation.

■■■ Midwest misunderstands the use of MAI 19.01. While it is true that Mrs. Closson did not allege that preexisting balance problems contributed to cause her fall, Midwest's defense was founded on trying to persuade the jury that those conditions caused her to fall. During Mid-

west's opening argument, counsel argued that Mrs. Closson "shuffles her foot, that she has gait disturbances, trouble walking." Counsel then stated, "You are being brought that evidence for one reason. It answers a question as to why would she have tripped, and should you really give her any damages?" Throughout the trial, Midwest's witnesses and counsel asserted that Mrs. Closson's poor balance and disequilibrium were the cause of her fall. And during its closing argument, Midwest repeatedly argued that Mrs. Closson's preexisting balance problems caused her to fall. Thus, while Mrs. Closson did not inject the issue of a preexisting condition into the case, Midwest most certainly did.

MAI 19.01 sets forth the verdict directing modification for "Multiple Causes of Damage." It provides as follows:

In a case involving two or more causes of damage, the "direct result" language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute one of the following:

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Third, such negligence either directly caused damage to plaintiff or combined with the [acts of *(here describe another causing damage)* ] [condition of the *(here describe product)* ] to directly cause damage to plaintiff.

Mrs. Closson used the first alternate language in her verdict director. Notes on Use 1 states, "There is no longer a prohibition against using the first alternate where plaintiff is at fault in light of adoption of pure comparative fault...." It further provides that "[t]hese modifications may be used *whether or not another causing damage is a party.*" (Emphasis added.) The Committee Comment reiterates that

the modification is intended to be allowed "in cases in which there are multiple causes of damage but which *may not involve another party or tortfeasor.*" (Emphasis added.) *See also Rinehart v. Shelter General Ins. Co.,* — S.W.3d —, —, 2008 WL 2414829, *7 (Mo.App. W.D. June 17, 2008). These explanations clearly indicate that any additional cause of damage does not have to originate from someone other than the plaintiff.

The Committee Comment to MAI 19.01 further explains that the modification is intended to employ the principles set forth in *Gaines v. Property Servicing Co.,* 276 S.W.2d 169 (Mo.1955), which stated:

The general rule is that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, *he is liable,* although his negligence was not the sole negligence or the sole proximate cause, and *although his negligence, without such other independent, intervening cause, would not have produced the injury.*

*Id.* at 173–74 (emphasis added, internal quotation omitted); *see also Rinehart,* — S.W.3d at —, 2008 WL 2414829, at *7. As noted above, Midwest's theory at trial was that any possible negligence on its behalf would not have caused Mrs. Closson to fall or produced any injury if she did not have preexisting balance and walking problems or had not failed to pick up her foot on that occasion. Thus, Midwest injected Mrs. Closson's preexisting conditions and walking problems into the case in order to cast blame on Mrs. Closson for her fall. It asserted that her shuffling her feet was the cause of her fall and resulting injuries, while Mrs. Closson, on the other hand, contended that she fell because of the unevenness of the floor surface. Thus, the jury was asked to determine the cause or causes of Mrs. Closson's fall and to

allocate the fault between her and Midwest.

In *Krenski v. Aubuchon,* 841 S.W.2d 721 (Mo.App. E.D.1992), *overruled on other grounds by Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104 (Mo. banc 1996), Amy Krenski was injured in a two-vehicle collision where she was the operator of one of the vehicles. *Id.* at 723–24. She filed suit against the defendant, who contested the cause of the accident and the fault therefore. *Id.* The jury returned a verdict finding Ms. Krenski's total damages to be $135,000 and allocating 75% of the fault to defendant and 25% to Ms. Krenski. *Id.* at 724. On appeal, the defendant contended that the trial court erred in giving Ms. Krenski's verdict director, which was modified in accordance with MAI 19.01's first alternative ("directly caused or contributed to cause damage to plaintiff."). *Id.* at 727. In rejecting the defendant's contention, the court stated, "Today's comparative fault system is not an outright bar to plaintiff's claim. Including this phrase, therefore, is consistent with the comparative fault instruction because plaintiff is allowed to recover even if plaintiff drove negligently." *Id.*

This Court's decision in *Snelling v. Gress,* 996 S.W.2d 538 (Mo.App. W.D. 1999), and the Eastern District's decision in *Higby v. Wein,* 996 S.W.2d 95 (Mo.App. E.D.1999), both support the *Krenski* court's determination. *Snelling* and *Higby* both recognize a preexisting injury or condition as a cause "additional to the defendant's alleged negligence, supporting the use of the modification language of MAI 19.01." *Higby,* 996 S.W.2d at 99; *see also Snelling,* 996 S.W.2d at 540. Accordingly, the trial court did not err in submitting the verdict director modified by MAI 19.01. Point denied.

The trial court's judgment is affirmed in all respects.

All concur.