Leo and Rose ZEMELMAN, Appellant,

v.

EQUITY MUTUAL INSURANCE COMPANY, Respondent.

No. WD 52117.

Missouri Court of Appeals, Western District.

Oct. 15, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 26, 1996.

Application to Transfer Denied Jan. 21, 1997.

William Robert Merryman, Kansas City, for Appellant.

Paul Paxton Hasty, Jr., Kansas City, for Respondent.

Before ELLIS, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LOWENSTEIN, Judge.

Appellants, Leo and Rose Zemelman (Zemelman), appeal the trial court's entry of summary judgment entered on behalf of their insurance company, the defendant-respondent, Equity Mutual Insurance Company (Equity Mutual). The Zemelmans assert that the underinsured motorist coverage of $50,000 per person in the insurance contract between the parties is ambiguous, and urge this court to apply the reasonable expectations doctrine to hold that the underinsured motorist coverage amounts to "excess coverage" and they are entitled to recover under their policy an amount over and above funds received from the tortfeasor. The sole question before this court is whether the underinsured motorist coverage ($50,000) takes effect and covers the policy holder's losses in excess of the tortfeasor's automobile liability policy ($100,000). Leo Zemelman's, loss of consortium claim will not be reviewed by this court since it was dismissed at the trial court.

In June of 1993, Rose Zemelman, while driving her insured automobile, was injured in a collision with another driver. She suffered serious injuries and ultimately, lost all use and control of her left arm such that she requires assistance to perform fundamental tasks. At the time of the hearing, she asserted considerable actual damages for health care costs totaling over $85,000.00. The trial court did not make a finding with regard to damages however, because that court found the policy plain and unambiguous and denied plaintiff/appellant's claim for underinsured motorist coverage. The Zemelman policy with Equity Mutual defined an underinsured vehicle as one with less coverage than the *underinsured* limits, and further read to allow Equity Mutual a set off for all sums paid by the tortfeasor.

Zemelman collected the $100,000 limit in a suit against the negligent driver who had automobile insurance liability limits of $100,000 per person and $300,000 per occurrence. The Zemelman's policy of automobile insurance covered three vehicles and included an underinsured motorist clause with recovery

limits of $50,000 per person and $100,000 per occurrence. There is no claim here for stacking underinsured policies.

Zemelman asserts that the policy is ambiguous with respect to the definition of underinsured, the "anti-stacking" set-off language under the limit of liability clause, and the "other insurance" clause. The pertinent provisions of the Zemelman's policy read as follows:

"We will pay compensatory damages which an insured is legally entitled to recover from the owner or operator of an underinsured vehicle because of bodily injury: (1) sustained by an insured; and (2) caused by an accident . . .

We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments of settlements . . .

Underinsured motor vehicle means land motor vehicle or trailer of any type to which a bodily injury bond or policy applies at the time of the accident but **it's limit for bodily injury liability is less than the limit of liability for this coverage.**

The limit of liability shown in the Schedule for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

1. 'Insureds.'
2. Claims Made,
3. Vehicles involved in the accident.

**However, the limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible.** This includes all sums paid under Part A of this policy.

Other Insurance

If there is other applicable similar insurance we will pay only our share of he loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. **However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.**" [Emphasis added]

In determining whether there is an ambiguity in the policy, the court must abide certain rules of construction. Where insurance policies are unambiguous, the rules of construction are inapplicable, and absent a public policy to the contrary, the policy will be enforced as written. *American Family Mutual Ins. Co. v. Ward,* 789 S.W.2d 791, 795 (Mo. Banc, 1990). Courts will not create an ambiguity in order to distort the language of an unambiguous insurance policy. *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d 379, 382 (Mo. Banc 1991). However, where provisions of an insurance policy are ambiguous, they are construed against the insurer. *Behr v. Blue Cross Hospital Service, Inc.,* 715 S.W.2d 251, 255 (Mo. Banc 1986). Language is ambiguous if it is reasonably open to two different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy. *Robin v. Blue Cross Hospital Service, Inc.,* 637 S.W.2d 695, 698 (Mo. Banc 1982).

Appellants urge the court to apply the reasonable expectation doctrine in interpreting the insurance policy at issue. That doctrine provides that where there is an ambiguity, the insured are entitled to a resolution of the ambiguity consistent with their objective and reasonable expectations. *Estrin Construction Co. Inc. v. Aetna Casualty & Surety Co.,* 612 S.W.2d 413 (Mo.App.1981). In order to apply the reasonable expectation doctrine, the court must first determine that the policy contains an ambiguity or is a contract of adhesion.

An adhesion contract is a form contract created by the stronger of the contracting parties. "It is offered on a 'take this or nothing' basis." *Robin v. Blue Cross Hosp. Service, Inc.,* 637 S.W.2d 695, 697 (Mo. Banc 1982). Underinsured motorist coverage is optional coverage and therefore, the underinsured motorist clause is not a contract of adhesion. There are no statutory nor public policy requirements in Missouri for underinsured motorist coverage. *Rodriguez,* 808 S.W.2d at 383.

This case must be distinguished from cases cited by Appellants where the term underinsured was not clearly defined in the automobile insurance policy. In *Krombach v. Mayflower Ins. Co.* 785 S.W.2d 728 (Mo. App.1990), the policy was deemed ambiguous because the term "underinsured" was not defined in the policy. Another line of cases invalidates anti-stacking provisions of underinsured motorist coverage and permits stacking of underinsured coverage where the policy fails to distinguish between uninsured and underinsured coverage. *Bergtholdt v. Farmers Ins. Co.*, 691 S.W.2d 357 (Mo.App.1985); *Maxon v. Farmers Insurance Co.* 791 S.W.2d 437 (Mo.App.1990); and *Tegtmeyer v. Snellen*, 791 S.W.2d 737 (Mo.App.1990). Unlike the above cases, the Zemelman's policy clearly distinguished and defined the term "underinsured" as separate from "uninsured."

The Supreme Court of Missouri considered language similar to the Zemelman policy language defining underinsured and providing for a set-off in the limit of liability section in *Rodriguez v. General Accident Ins. Co. of Am.*, 808 S.W.2d 379 (Mo. Banc 1991). The *Rodriguez* policy defined the scope of the underinsured motorist coverage as follows:

"INSURING AGREEMENT

A. We will pay damages which an 'insured' is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle' because of 'bodily injury'. . . .

C. 'Underinsured motor vehicle' means a vehicle to which a policy applies at the time of the accident but **its limits for bodily injury liability is less than the limit of liability for this coverage.**

LIMIT OF LIABILITY

A. The limit of liability shown in the schedule for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

1. 'Insureds';

2. Claims made;

3. Vehicles of premiums shown in the Declarations; or

4. Vehicles involved in the accident

**However, the limit of liability shall be reduced by all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible.** This includes all sums paid under part A of this policy." [Emphasis added] *Rodriguez*, 808 S.W.2d at 379.

In *Rodriguez*, the Supreme Court found the language of that policy concerning the definition of underinsured and the limit of liability unambiguous. *Rodriguez*, 808 S.W.2d at 383, *Trapf v. Commercial Union Ins. Co.*, 886 S.W.2d 144 (Mo.App.1994). Thus, under a *Rodriguez* type policy, if the other motorist pays as much or more to the insured for bodily injury as the insured has underinsured coverage, the insured is not permitted to recover under the underinsured coverage. In accordance with the Supreme Court ruling, this court holds that underinsured motorist and the limit of liability language in the Zemelman policy are unambiguous.

*Rodriguez* has been followed and interpreted in a number of cases. In *Diehl v. Valley Forge Ins. Co.*, 810 S.W.2d 670 (Mo. App.1991) the court, citing *Rodriguez*, held that a tortfeasor is not "underinsured" where his liability policy limit is equal to or greater than the insured's underinsured motorist coverage and that the insurer is entitled to set-off the underinsured motorist coverage by any amount the insured recovered from the tortfeasor. The *Diehl* court denied Appellants argument that the definition of underinsured motorist coverage should supplement amounts paid by the tortfeasor stating, "[appellant] purchased protection to an agreed amount, not excess coverage." *Diehl*, 810 S.W.2d at 671.

*Trapf v. Commercial Union Ins. Co.*, 886 S.W.2d 144 (Mo.App.1994), again followed *Rodriguez* in considering the scope of underinsured coverage. Following the logic of *Rodriguez*, the *Trapf* court held that the definition of underinsured was unambiguous and that the tortfeasor was not underinsured since her insurance liability limits exceeded the Trapf's underinsured coverage. According to the *Trapf* court, underinsured coverage "would cover a loss that exceeded the recovery from a tortfeasor only if the loss

was greater that the limits of the tortfeasor's policy, and if the insured's underinsured coverage exceeded the tortfeasor's coverage limits." *Trapf,* 886 S.W.2d at 147. The court also noted that the Trapfs had underinsured coverage of $25,000 per person and $50,000 per occurrence, and that those are the minimum amounts of liability coverage required by state law. *Trapf,* 886 S.W.2d at 147. So, in effect, the Trapfs paid premiums for underinsured coverage under which they would never collect. The court further noted "the fact that there is no actual underinsured motorist coverage in the *Trapf* policy does not make it unambiguous." *Trapf,* 886 S.W.2d at 147.

Zemelmans here assert an additional ambiguity not discussed in *Rodriguez* and its progeny. They argue that ambiguity arises in the "Other Insurance" or "Excess" clause of the Zemelman policy, and maintain that *Krenski v. Aubuchon,* 841 S.W.2d 721 (Mo. App.1992) and *Killpack v. Farm Bureau Town & Country Ins. Co.,* 861 S.W.2d 608 (Mo.App.1993) should control because those cases addressed and found ambiguity in "Other Insurance" clauses. Each of those cases found the excess insurance clause could be read to provide coverage over and above the amount collected from the tortfeasor.

In *Krenski,* the court deemed the insurance policy ambiguous in the limit of liability language, in determining the manner of calculating the set-off, and also in the excess insurance clause. The policy stated that "underinsured motor vehicles coverage shall be excess over all ... insurance policies applicable at the time of the accident." The Eastern District found that language ambiguous when read in conjunction with limits of liability subsection. *Krenski,* 841 S.W.2d at 731. The court found that the "excess" language could leave an average lay person with the impression that coverage is provided over and above that furnished by the tortfeasor's insurance. *Id.* at 731.

The Other Insurance clause in the Zemelman policy is similar to that in *Krenski* and states:

"[I]f there is other applicable similar insurance we will pay only our share of the loss. Our share is the proportion that our limit

of liability bears to the total of all applicable limits. **However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance."** [Emphasis Added]

The *Krenski* policy specifically states that the underinsured coverage is excess over other policies whereas the Zemelman policy states, "insurance we provide with respect to a vehicle that you do not own is excess ..." Since underinsured coverage can be reasonably interpreted as "coverage for a vehicle that you do not own," the policies contain similar ambiguities. While the language in the *Krenski* and Zemelman policies is not the same, the excess insurance clauses contain similar terms which may reasonably be interpreted to provide underinsured coverage as excess to amounts recovered from the tortfeasor.

While it is not controlling, this court did adopt *Krenski* in deciding *Killpack v. Farm Bureau Town & Country Ins. Co.* 861 S.W.2d 608 (Mo.App.1993). The *Killpack* policy contained a definition of underinsured motor vehicle and limit of liability language substantially the same as the Zemelman policy language. Although the tortfeasor in *Killpack,* unlike the tortfeasor in Zemelman, did meet the definition of underinsured in that his liability insurance limit was less than Killpack's underinsured coverage, the ambiguity created in Killpack's excess insurance clause remains instructive here. *Killpack* found an ambiguity in both the set-off language, and the excess insurance clause. The *Killpack* court determined the excess insurance language which read: "Coverages under this endorsement shall be excess of any applicable automobile liability insurance" *Killpack,* 861 S.W.2d at 611, was analogous to the excess language in *Krenski* and held that the ambiguity required construction in favor of the insured. *Id.*

■ In essence, the courts have carved a nitch which allows the insured to avoid the harsh effect of *Rodriguez* and the unambiguous definition of underinsured and limit of liability language. Where there is an "excess" or "other insurance" clause that pro-

vides the underinsured coverage is excess over all other collectible insurance at the time of the accident, a court may find that language is ambiguous when read with the limit of liability or the definition of underinsured motorist coverage if the other insurance clause may reasonably be understood to provide coverage over and above that collected from the tortfeasor. In *Rodriguez,* only the underinsured motor vehicle definition and the limit of liability language were held unambiguous and the court did not address the issue of an excess insurance clause. Thus, where this third clause exists and is raised as ambiguous, courts have held the first two clauses unambiguous and found an ambiguity arises in the "Other Insurance" clause and that is our holding here.

Because of the design of the policy language here as to underinsurance and setoff, this opinion is extended to explore this area of underinsurance coverage which is being sold to the public.

After examining the thicket of cases dealing with policy language of underinsurance coverage, it becomes obvious that an insured who opts for underinsurance coverage should read the language of a tendered policy very carefully. If language clearly states that coverage must be greater than a potential tortfeasor's, and any amounts recovered from the tortfeasor's insurance will be set-off against your underinsured limits, then underinsured coverage may be of little or, at best, negligible protection. Absent an ambiguity within the policy or declaration of public policy, the law affords no legal reasonable expectation of what this additional coverage may afford. Respondent Equity Mutual's policy definition of underinsured, and the set-off provision, which are both keyed to underinsured limits taken out by the policyholder rather than damages suffered, create very little risk to the insurer, and afford scant protection for the motoring public which chooses to defray large losses which are not satisfied by another negligent motorist.

Several examples of the practical effect of enforcing Equity Mutual's language on "underinsured motor vehicle" and "set-off" are now presented in hypothetical situations. All the examples assume, as our law requires, that policy limits have been recovered from the tortfeasor's carrier. *Lewis v. State Farm Mutual Auto. Ins. Co.,* 857 S.W.2d 465, 467 (Mo.App.1993). These hypotheticals compare net results where underinsurance is keyed to the damages or loss, and assume no recovery for an insured beyond his or her loss from the accident. Again, in the case at bar, the variables are:

$100,000—Tortfeasors policy limits per person

$50,000—Plaintiff's underinsurance limit per

$85,000—Plaintiff's actual damages (at this stage).

In this situation, given Equity Mutual's position, the tortfeasor had more insurance than the plaintiff had underinsured coverage, so there would be no coverage under the policy definition, but, in any event, the limits having been recovered from the tortfeasor, would be set-off against the underinsured coverage, leaving no amount due the policyholder.

The following examples assume a $100,000 actual loss, the same underinsurance coverage as in this case, and only the amount of insurance carried by the tortfeasor is changed.

$0—Tortfeasor has no insurance

$50,000—Underinsurance and $25,000 mandatory uninsured

$100,000—damages

Insured would collect only $25,000 of *uninsured* coverage. An uninsured tortfeasor, under the policy in this case would not open the door for underinsured coverage, no matter the coverage or loss.

$25,000—Tortfeasor's limits

$50,000—Underinsurance

$100,000—Damages

Tortfeasor's car would meet the definition of underinsured, $25,000 would be set-off against underinsured limits, and insured would recover $25,000 from his carrier. Insured does not receive his full loss of 100K. His maximum recovery is established by the amount of underinsured coverage. (50K)

$50,000—Tortfeasor's limits

$50,000—Underinsurance

$100,000—Damages

No recovery here since the other car does not meet definition of underinsured, in that the tortfeasor has the same coverage as policy holder's underinsurance, and set-off would wipe out benefits anyway.

$25,000—Tortfeasor

$100,000—Underinsurance

$100,000—Damages

The other car meets the definition of underinsured. $25,000 recovery set-off against underinsured coverage, for recovery of $75,000 against underinsured carrier. In this instance, insured will recover his full *loss* (100K) but only because it is the same amount as his underinsured motorist coverage.

$50,000—Tortfeasor

$100,000—Underinsurance

$100,000—Damages

Underinsurance applies. $50,000 set-off and net underinsured recovery of $50,000. This would also be the result under the method approved today.

$100,000—Tortfeasor

$100,000—Underinsurance

$100,000—Damages

Underinsurance does not apply nor afford any payment under either the definition or the set-off language.

In the following examples, the loss is $200,000 and the policyholder has purchased $150,000 underinsured coverage.

$50,000—Tortfeasor

$150,000—Underinsurance

$200,000—Damages

Underinsured coverage would apply. $50,000 set-off against $150,000, net recovery to insured underinsured motorist coverage of $100,000.

$100,000—Tortfeasor

$150,000—Underinsurance

$200,000—Damages

Underinsurance would apply. Policyholder, after $100,000 set-off would receive $50,000 from carrier. However, if underinsured benefits were keyed to the loss, then the company would pay $100,000.

What becomes clear from these examples is there is a great benefit to insurance companies in writing policies and having them construed to an interpretation proposed by Equity Mutual. Without going through more calculations on different fact situations, it becomes clear that the definition of underinsured and set-off provisions in this policy, in this case, provide little or no coverage to the insurance customer. It is also clear that a set-off provision against underinsured motorist coverage rather than against damages is less equitable and is calculated so that the insurer never has to pay the limit of coverage to the underinsured motorist. *State Automobile Mutual Insurance Company v. Youler,* 183 W.Va. 556, 396 S.E.2d 737, 747–50 (1990). If, as the cases hold, the reasonable expectation of an insurance buyer is to purchase protection against large losses, and cover when the other driver's insurance does not satisfy those losses, then the buyer receives very little protection, and is without recourse after a loss has occurred.

When analyzing the policy in this case, it is clear that had the respondent company avoided the ambiguity created by the "other insurance" language, and had a strict *Rodriguez* analysis been necessitated by this court, the tortfeasor's car would not have been underinsured, and the policy limit of recovery would have totally offset the $50,000 underinsured coverage chosen by the insureds.

 As stated before, Missouri has no statute which defines or requires underinsurance coverage. *Krombach,* 827 S.W.2d at 211, 1 Mo. Ins. Practice, § 6.26 (4th Ed.1995). "From an objective point of view, the objective of underinsured motorist coverage is always the same: to cover them for damages over and above that which the tortfeasor can provide." *Id; Tegtmeyer,* 791 S.W.2d at 740. "Because an insurance contract is designed to furnish protection, it will be interpreted to grant coverage rather than defeat coverage." *American Family Mutual Ins. Co. v. Turner,* 824 S.W.2d 19, 21 (Mo. App.1991). *See Marshall v. Northern,* 854 S.W.2d 608, 611 and *Krombach v. Mayflower,* 785 S.W.2d 728, 733 (Mo.App.1990). A majority of states spell out and define underinsurance coverage, amount, availability and set-off provisions. Vol. III Widiss, Unin-

sured and Underinsured Motorist Insurance, § 6.26. (1995). For, as can be seen, the definition and set-off provisions between the two alternative methods, make a great difference in the scope and effect of such insurance for customers.

Minnesota, by legislation, (Minn.Stat. § 65 B.43 sub 17 and 18 (1986)) has stated that as a matter of public policy, an underinsured vehicle is one "with a policy limit ... less than the amount needed to compensate the insured for actual damages." The Iowa Supreme Court in *Hernandez v. Farmers Ins. Co.*, 460 N.W.2d 842, 844 (Iowa 1990) said the legislation concerned only prohibiting duplicate benefits, and an "other insurance" provision would not be enforced in contravention of the purpose of underinsured motorist coverage which is "aimed at full compensation of the victim."

To insure underinsurance protection and effective insurance planning for Missouri motorists, either the legislature should act, or the Director of Insurance, through powers granted in chapter 374, should promulgate a rule requiring carriers to include a warning in their policies to the effect that if the definition of an underinsured motorist is tied to underinsured benefits and if set-off provisions allow set-off from underinsured coverage rather than damages suffered by the policyholder, then the insurance afforded may be rendered illusory. *Trapf* referred to a policy which comported with *Rodriguez* (and two portions of the Equity Mutual policy) as supplying "... no actual underinsured coverage ... " *Trapf*, 886 S.W.2d at 147. *See also Stracener v. United Services Automobile Assoc.*, 777 S.W.2d 378, 383( Tex.1989), where the court would not interpret an set-off provision to allow a result where "... the underinsured motorist coverage for which the policyholder has paid a premium would be worthless ..."

The judgment is reversed and the cause is remanded for further action in accordance with this opinion.

All concur.