Alfreda TAPLEY, Plaintiff–
Respondent,

v.

SHELTER INSURANCE COMPANY,
Defendant–Appellant.

No. 24638.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 30, 2002.

Samuel P. Spain, Spain, Merrell & Miller, L.L.P., Poplar Bluff, for appellant.

John M. Albright, Moore & Walsh, L.L.P., for respondent.

PHILLIP R. GARRISON, Judge.

Shelter Insurance Company ("Shelter") contends that the trial court erred in awarding Alfreda Tapley ("Plaintiff") benefits under the underinsured motorist provision of an automobile insurance policy it issued to her. Plaintiff's suit against Shelter for those benefits was submitted to the trial court on the following stipulated facts: On November 22, 1999, the car Plaintiff was driving ("Plaintiff's vehicle") was involved in an accident with a truck owned and operated by Phillip W. Poe ("Poe"); that accident was directly caused by Poe's negligence, and as a direct result Plaintiff was injured, with resulting damages of $150,000 or greater; Poe's truck was insured by State Farm Mutual Automobile Insurance Co. ("State Farm"), which paid Plaintiff its policy limits of $100,000 in settlement of all claims against State Farm and Poe; Poe had no further liability insurance covering him for the accident in question; Plaintiff's vehicle was insured under a policy issued by Shelter ("the Shelter policy") that included an endorsement providing for underinsured motorist coverage; Plaintiff made a claim for underinsured motorist benefits under that policy; and Shelter refused to honor Plaintiff's claim, contending that Poe's vehicle was not an "underinsured motor vehicle" under its policy. The parties requested that the trial court determine whether Plaintiff was entitled to benefits under the underinsured motorist coverage of the Shelter policy.

The Shelter policy includes an endorsement for underinsured motorist coverage of $50,000 per person and $100,000 per accident. That endorsement defines an **"Underinsured motor vehicle"** as:

> (a) An insured **motor vehicle** when the sum of the limits of liability of the auto bodily injury liability insurance coverage and bonds on such vehicle is less than the limits of liability of the uninsured motorist coverage carried on this policy.

The "uninsured motorists" coverage provided under the Shelter policy was $25,000 per person and $50,000 per accident.

In its judgment, the trial court interpreted the policy language to mean that a

vehicle would be underinsured only if it carried less than $25,000 in liability coverage. Since the statutory minimum limit for liability coverage in Missouri is $25,000,[1] the trial court found that two possibilities existed if Plaintiff was involved in an accident with another vehicle: (1) the other vehicle would have no insurance, in which event the "uninsured" motorist coverage would apply and the "underinsured" coverage, by definition, would not; or (2) the other vehicle would have at least the statutory minimum $25,000 per person coverage, which would result in the underinsured motorist coverage not applying, since the other vehicle would not have less liability coverage than the uninsured coverage under the Shelter policy. The trial court said, "[t]herefore, it appears that the underinsured coverage would never come into play," even though the "policy promises $50,000.00 in underinsured coverage." The court concluded that "this creates an ambiguity" and found that Plaintiff should receive $50,000 from Shelter under the policy. This appeal followed.

In its sole point on appeal, Shelter contends that Poe's automobile was not an "underinsured motor vehicle" under its policy definition, which it characterizes as clear and unambiguous. Shelter points out that its policy defines an "underinsured motor vehicle" as one that has less liability insurance than the "uninsured" motorist coverage under the Shelter policy. Since the Poe vehicle had $100,000 in liability coverage, while the Shelter policy had $25,000 in "uninsured" motorist coverage, Shelter concludes that the underinsured motorist coverage under its policy is inapplicable.

■■■ When a case is tried on stipulated facts, as was this case, the only issue on appeal is whether the court drew the proper legal conclusions from those facts. *Goza v. Hartford Underwriters Ins. Co.,* 972 S.W.2d 371, 373 (Mo.App. E.D.1998). The interpretation of an insurance policy is a question of law. *Id.* The same is true in determining whether an insurance policy is ambiguous. *Ware v. Geico General Ins. Co.,* 84 S.W.3d 99, 102 (Mo.App. E.D.2002).

■■■ In interpreting the language of an insurance policy, we give the language its plain meaning, which is the meaning that would ordinarily be understood by a layperson who bought the policy. *Id.* An ambiguity arises when there is duplicity, indistinctness or uncertainty in the meaning of the words used in the insurance policy. *Id.* If an ambiguity exists in an insurance policy, it is construed against the insurer because insurance is designed to furnish, not defeat, protection to the insured and the insurance company is in the best position to remove ambiguity from a contract. *Id.* A court is not, however, permitted to create an ambiguity in order to distort the language of an unambiguous policy, or enforce a particular construction which it might feel is more appropriate. *Rodriguez v. General Acc. Ins. Co. of America,* 808 S.W.2d 379, 382 (Mo. banc 1991). Absent an ambiguity, an insurance policy must be enforced according to its terms. *Robin v. Blue Cross Hospital Service, Inc.,* 637 S.W.2d 695, 698 (Mo. banc 1982).

■■■ Several Missouri appellate decisions lead us to the conclusion that the trial court erred in holding as it did. Our analysis begins with *Rodriguez.* There, the plaintiffs' policy defined an underinsured motor vehicle as one having insurance coverage "less than the limit of liabili-

---

**1.** *See* Sections 303.025.1 and 303.190, and *American Standard Ins. Co. v. Hargrave,* 34 S.W.3d 88, 90 (Mo. banc 2000). References to statutes are to RSMo (2000) unless otherwise indicated.

ty for this coverage." The plaintiffs had underinsured motorist coverage of $50,000, and the tortfeasor had $50,000 in liability coverage, which was paid to the injured plaintiff. The Missouri Supreme Court held that the policy was not ambiguous, and that the plaintiffs were not entitled to any underinsured motorist coverage. *Id.* at 383. In doing so, the court held that the policy clearly stated that an underinsured motor vehicle is one whose limit for bodily injury liability is less than the limit of liability for the underinsured motorist coverage. *Id.* at 382. "Since [the tortfeasor's] coverage is equal to the limit of liability under the [plaintiffs'] policy, [the tortfeasor] was not an underinsured motorist as defined by the [plaintiffs'] policy." *Id.* The court concluded by saying that "[c]onsidering the clarity with which the underinsured motorist coverage is defined in the policy, we hold that it is neither ambiguous nor misleading." *Id.*

*Hinshaw v. Farmers and Merchants Ins. Co.,* 912 S.W.2d 70 (Mo.App. E.D. 1995), involved identical pertinent facts as *Rodriguez,* and reached the same result. There, the court held that the insured was not entitled to collect underinsured motorist benefits because the tortfeasor's vehicle did not meet the policy definition of an underinsured motor vehicle. *Id.* at 72–73. The court also made a point of the fact that had the insured bargained for higher underinsured motorist coverage, benefits from that coverage would have been available. *Id.* at 73.

*Rodriguez* and *Hinshaw* did not involve policies defining an underinsured motor vehicle as one with less than $25,000 liability coverage and thus did not present exactly the same factual scenario, as here, where underinsured coverage would never be available because the other vehicle would not be both insured (thereby meeting the first requirement of the "underin-

sured motor vehicle" definition), and have less than $25,000 in liability coverage (the statutory minimum in Missouri), unless it were a vehicle from another state with lower mandatory minimum coverage. That situation did occur, however, in *Trapf v. Commercial Union Ins. Co.,* 886 S.W.2d 144 (Mo.App. E.D.1994). There, the plaintiffs were paid the tortfeasor's liability insurance limits of $50,000. They then made a claim under the underinsured motorist coverage provided by their own policy, the limits for which were $25,000 per person and $50,000 per collision. *Id.* at 145. The plaintiffs' policy defined an underinsured motor vehicle as one having liability insurance "less than the limit of liability for this coverage." *Id.* at 146.

On appeal, the *Trapf* court held that the tortfeasor's vehicle was not an underinsured motor vehicle as "clearly and unambiguously" defined under the plaintiffs' policy because the tortfeasor's policy provided more coverage than the underinsured limits in the plaintiffs' policy. *Id.* at 147. In language particular appropo to this case, the court said:

> [the tortfeasor] had coverage of $50,000 per person. This exceeded the limits of the [plaintiffs'] claimed underinsured motorist coverage, $25,000 per person. The [tortfeasor] vehicle was not an underinsured vehicle, as alleged. *The true complaint about the underinsured motorist coverage in the [plaintiffs'] policy is that the limits of coverage are too low in relation to [the tortfeasor's] coverage to prove a benefit. But that is the policy the [plaintiffs] purchased. They have agreed to provisions, as written, which would be unambiguous if they had purchased underinsured coverage in an amount greater than in the tortfeasor . . . policy* (emphasis added).

*Id.* Finally, the court said, "*The fact that there is no actual underinsured motorist*

*coverage in the [plaintiffs'] policy does not make it ambiguous."* (emphasis added). See also *Melton v. Country Mut. Ins. Co.,* 75 S.W.3d 321, 327 (Mo.App. E.D.2002).

The facts in *Trapf* are analogous to the instant case. In both cases, the applicable limit of the underinsured motorist coverage was $25,000, and in order for the tortfeasor's vehicle to be an underinsured motor vehicle under the policy definition, it would have to be both insured and have less than $25,000 liability coverage, a scenario that would not materialize, assuming Missouri's financial responsibility law applied to the tortfeasor's vehicle. The only difference between *Trapf* and this case is that, in *Trapf,* the policy defined an underinsured motor vehicle as having less liability coverage than the "underinsured" motorist coverage in that policy, while here, the tortfeasor's liability coverage was compared to the limits of Plaintiff's "uninsured" coverage. We fail to see this as a meaningful distinction. In both instances, the policies clearly describe the coverage or basis to be used to determine if the tortfeasor is an "underinsured" motorist. The fact that one refers to the "underinsured" limits and one refers to the "uninsured" limits cannot be manipulated to reach the conclusion that there is an ambiguity in the latter where none exists in the former. Especially is this true where the limits of the coverage used in determining whether the tortfeasor's vehicle meets the underinsured motor vehicle definition under both scenarios is $25,000, and the *Trapf* court held that the underinsured definition was not ambiguous simply because there is no actual coverage under those facts. The trial court erred, therefore, in finding that the policy was ambiguous in the manner described in its judgment.

■ According to Plaintiff, however, this conclusion should not end our review.

Plaintiff reiterates arguments made in the trial court that the underinsured motorist provisions of the Shelter policy are ambiguous for reasons other than the one delineated by the trial court, and that those ambiguities should result in our construing the policy in her favor. Consistent with this is the premise that we will not reverse a judgment where the trial court reached the right result but for the wrong reason. *Mercantile Bank of Sikeston v. Moore,* 935 S.W.2d 762, 770 (Mo.App. S.D.1996). Our analysis is extended, therefore, to consider Plaintiff's contentions concerning other ambiguities in the policy.

■ One provision Plaintiff claims is ambiguous is titled "Limits Of Liability." It provides, in part:

(3) Any amount payable under the terms of this Coverage will be reduced by any amount paid or payable for the same damages to or for an **insured**: (a) by or for any person or organization who is or may be held legally liable for the **bodily injury** to an **insured**[.]

Plaintiff argues that cases such as *Krombach v. Mayflower Ins. Co., Ltd.,* 827 S.W.2d 208, 210–11 (Mo. banc 1992) ("*Krombach II*") and *American Family Mut. Ins. Co. v. Turner,* 824 S.W.2d 19, 22 (Mo.App. E.D.1991), have determined that similar provisions to this "any amount payable" clause are ambiguous.

In *American Family,* the court considered an underinsured motorist policy containing an "any amounts payable" clause. The underinsured motorist policy limits were $100,000 per person and $300,000 per accident. *Id.* The insured sustained damages in excess of $100,000 and was paid the $100,000 policy limits of the tortfeasor. *Id.* The underinsured motorist policy endorsement provided, *inter alia:*

We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle.

ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT ONLY

(3) Underinsured motor vehicle means a motor vehicle which is insured by a liability bond or policy at the time of the accident *which provides bodily injury liability limits less than the damages an insured person is legally entitled to recover.*

LIMITS OF LIABILITY

Any amounts payable will be reduced by:

(1) A payment made or amount payable by or on behalf of any person or organization which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle.

*Id.* at 20–21 (emphasis in original). American Family contended that the "amounts payable" language referred to the policy limits for underinsured motorist coverage. *Id.* at 22. In finding that the "amounts payable" clause was ambiguous, the court distinguished the definition of an underinsured motor vehicle in that case (tortfeasor's liability insurance is less than *the damages the insured is legally entitled to recover*) from that found in *Rodriguez* (tortfeasor's coverage is less than *the limit of liability for this coverage* ). *Id.* As indicated earlier, the definition in the instant case is substantially the same as in *Rodriguez.* The court also noted that in *Rodriguez* the set-off provision provided that the "*limit of liability* " (referring to the limits

of the underinsured motorist coverage) was reduced by sums paid by the tortfeasor, while the *American Family* policy provided that "[a ]*ny amounts payable* will be reduced by" payments from the tortfeasor. *Id.* at 22. The court said that "in the context of the policy" the "amounts payable" clause was ambiguous, and it construed that provision to mean the insurer's liability was to be determined by deducting the amount of the tortfeasor's payment from the damages sustained by the insured, and then applying the underinsured motorist policy limits. *Id.*

In *Krombach II,* the plaintiffs settled their personal injury and loss of consortium claims with the tortfeasor's liability carrier, and then sought to recover under their own underinsured motorist coverage, which had a $50,000 limit. *Id.* at 210. The plaintiffs' policy had been declared ambiguous in an earlier case because it did not contain a specific definition of an underinsured motor vehicle. *Krombach v. Mayflower Ins. Co., Ltd.,* 785 S.W.2d 728, 734 (Mo.App. E.D.1990) ("*Krombach I* ").[2] In *Krombach I,* the court determined that the appropriate definition of underinsured motor vehicle was that which the normal purchaser of such insurance would expect, i.e., a motor vehicle with less liability coverage than the damages sustained by the insured. *Id.* at 733–734. Thus, the same definition of an underinsured motor vehicle applied in *Krombach* as in *American Family.*

One of the issues in *Krombach II* was whether, under the plaintiffs' underinsured motorist coverage, amounts received from the tortfeasor were to be set off against the amount of the plaintiffs' underinsured coverage limits (in which event no addi-

2. The policy in *Krombach I* provided that "[t]he term *'uninsured motor vehicle'* also includes an underinsured motor vehicle" but did not specifically define an "underinsured motor vehicle." The appellate court held that this resulted in an ambiguity. *Id.*

tional payments would have been owing to plaintiff), or whether they were to be deducted from plaintiffs' total damages (in which event they would be entitled to recover all damages in excess of the amounts paid by the tortfeasor's carrier up to the limits of their underinsured coverage). The Missouri Supreme Court said that the problem with the policy was that both the tortfeasor's total liability and the underinsured motorist coverage limits were referred to as "amount payable" in different places in the policy. The court found an ambiguity because the "reduction clause" did not say which "amount payable" was intended, and held that "[h]aving failed to make clear which 'amount payable' was intended, the insurer must bear the burden of the resulting confusion." *Id.* at 211. The court construed the policy so as to provide coverage under the underinsured motorist provisions for the total damages caused by the tortfeasor minus the amounts paid by the tortfeasor, up to the limit of the underinsured coverage. *Id.*

In support of her contention that the "any amount payable" clause here is similarly ambiguous, Plaintiff points out that the Declarations portion of the underinsured endorsement provides:

> **We** will pay damages for **bodily injury** sustained by an **Insured** which such **insured** or such **insured's** legal representative is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** .... **Our** obligation shall apply only to such damages as are in excess of the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages and available to cover the **insured's** damages....

In another provision of the Limits Of Liability section of the endorsement, it is provided:

> (5) **Our** maximum liability under the underinsured motorists coverage shall be the amount of damages for **bodily injury** sustained by an **insured** less the amount paid to such **insured** by or for any person or organization which may be held legally liable for the **bodily injury.** In no event shall **our** maximum liability under such coverage be more than the limits of the underinsured motorists coverage provided under this policy.

Plaintiff also points out that at several places in the policy, it is provided that the limit of liability for underinsured motorist coverage is $50,000, and argues that, in the context of this policy, the "[a]ny amount payable under the terms of this Coverage" clause is ambiguous. We disagree.

The endorsement says that Shelter's underinsured motorist's coverage applies to the amount that an insured's damages exceed the liability limits of the owner or operator of an underinsured motor vehicle. It also says that Shelter's maximum liability is the insured's damages less the amount paid by the tortfeasor. These provisions are consistent with the "any amount payable" clause here, which provides that any amount payable under the underinsured motorist's coverage will be reduced by any amount paid or payable by the tortfeasor. Unlike *Krombach II* and *American Family*, here the policy unambiguously provides that *if the underinsured motorists coverage applied at all,* Plaintiff would be entitled to the full $50,000 (her damages of over $150,000 minus the $100,000 liability limits paid by Poe's carrier).

Additionally, both *Krombach II* and *American Family* involved underinsured motorist policy provisions describing an "underinsured motor vehicle" as one with less liability coverage than the damages an insured person is legally entitled to recov-

er. *Krombach II* at 210; *American Family* at 20. In neither of those cases was there an issue concerning whether the tortfeasor was in fact an underinsured motorist as defined in the policy. As indicated above, the *American Family* court distinguished that case from *Rodriguez* based, in part, on the differences between the definition of an underinsured motor vehicle in the policies in those cases. In *Rodriguez* the court found that the insured was not entitled to underinsured benefits because the tortfeasor's vehicle did not meet the policy definitions of an underinsured vehicle. *Id.* at 382. The definition in *Rodriguez* was substantially identical to the definition in the Shelter policy. The disposition in *Rodriguez* would seem to validate Shelter's argument that if the tortfeasor's vehicle is not underinsured under the policy definition, no coverage is afforded.

There is a line of cases, however, holding that an ambiguity in the policy relating to the calculation of benefits under an underinsured motorist policy can result in a finding in favor of coverage even when the tortfeasor's vehicle was not an underinsured motor vehicle under the policy's unambiguous definition of that term. *See Goza v. Hartford Underwriters Ins. Co.,* 972 S.W.2d 371 (Mo.App. E.D.1998); *Jackson v. Safeco Ins. Co. of America,* 949 S.W.2d 130 (Mo.App. S.D.1997); *Zemelman v. Equity Mut. Ins. Co.,* 935 S.W.2d 673 (Mo.App. W.D.1996); and *Krenski v. Aubuchon,* 841 S.W.2d 721 (Mo.App. E.D. 1992).[3] Each of these cases dealt with conflicting provisions indicating, in one place, that the underinsured motorist coverage was excess over the tortfeasor's coverage, and, in another place, that the tortfeasor's coverage was to be deducted from the limits of liability of the insured's un-

derinsured coverage. Here, however, the policy clearly provides that the underinsured coverage is excess over the tortfeasor's coverage, subject to the limits of liability for underinsured coverage. Accordingly, here we do not have the conflicting provisions and ambiguities relied on in those cases.

This distinction is similar in principle to that reached in *State Farm Mut. Auto. Ins. Co. v. Sommers,* 954 S.W.2d 18, 20 (Mo.App. E.D.1997), where the policy provisions were found not to be in conflict on the issue of whether the underinsured coverage was excess, and, therefore, the court held that *Krenski, Zemelman* and *Jackson* were not controlling. The same is true with reference to *Lang v. Nationwide Fire Ins. Co.,* 970 S.W.2d 828, 832 (Mo.App. E.D.1998), where the court distinguished *Zemelman* because, unlike that case, in *Lang* there were no ambiguities or conflicts in the policy concerning the calculation of coverage. Plaintiff's reliance on such cases as Krenski, *Zemelman,* Jackson and *Goza* is, therefore, misplaced.

Plaintiff argues that the policy includes yet another ambiguity. She points out that the policy refers in several places to $50,000 in underinsured motorist coverage. The policy also provides that (1) any amount payable will be reduced by any amount paid by the tortfeasor; (2) the policy's definition of "underinsured motor vehicle" requires the tortfeasor to have liability insurance; and (3) the policy's definition of an "uninsured" motorist includes motor vehicles that are insured but the company writing the insurance denies coverage. Plaintiff contends that, given these limitations, in order for there to be underinsured motorist coverage the tortfeasor's vehicle must be insured and some payment must be made by the tortfeasor's carrier to

---

**3.** *Krenski* was overruled in part in *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 108

(Mo. banc 1996) for reasons wholly unrelated to the instant case.

the insured, with the result that Shelter would never be required to pay the full $50,000 in coverage. Plaintiff argues that this renders the policy duplicitous and, therefore, ambiguous, requiring us to construe the provision against Shelter.

This argument assumes a policy with a reduction clause similar to that found in *Rodriguez* (the maximum payment is the underinsured coverage limit minus the payment from the tortfeasor). As indicated earlier, the policy here provides that "any amount payable" is to be reduced by payments from the tortfeasor, in contrast to the *Rodriguez* language, where the "limit of liability" would be reduced by those payments. As unambiguously provided in this policy, "any amount payable" means that the total of the insured's damages is reduced by the tortfeasor's payment in determining the coverage available under the underinsured motorist endorsement, subject, of course, to the limits of that coverage. As it applies to this case, therefore, this argument of Plaintiff is inapplicable.

Even if the "amount payable" clause in this policy were comparable to that in *Rodriguez*, an argument similar to Plaintiff's was rejected in *Rodriguez* when the Missouri Supreme Court refused to follow *Weber v. American Family Mutual Ins. Co.*, 868 F.2d 286 (8th Cir.1989), in which the Eighth Circuit reasoned that where the insured would never reach the limits of liability for underinsured motorist coverage, such coverage was meaningless or misleading. The *Rodriguez* court held that *Weber* was an example of a court creating an ambiguity in order to distort the language of an unambiguous policy, and rejected that holding "as inconsistent

with Missouri law." *Id.* at 383. In a footnote, the court said that "[i]t is difficult to understand why the mathematical inability to collect a full $50,000 in underinsured motorist coverage renders the coverage meaningless." *Id.* at 383 n. 1. Plaintiff's argument here is essentially the same as that rejected by *Rodriguez*, a conclusion by which we are bound because we must follow the latest decision of our supreme court on an issue. MO. CONST. art. V, § 2 (1945); *Ferrellgas, L.P. v. Williamson*, 24 S.W.3d 171, 178 (Mo.App. W.D.2000). As in *Rodriguez*, the argument is therefore rejected here.

■■■ Finally, Plaintiff argues that the underinsured provisions of the policy here violate public policy as codified in Section 379.204. That statute, adopted in 1999, provides that:

> Any underinsured motor vehicle coverage with limits of liability less than two times the limits for bodily injury or death pursuant to section 303.020, RSMo, shall be construed to provide coverage in excess of the liability coverage of any underinsured motor vehicle involved in the accident.

■■■ Section 303.020 contains the definition of "Proof of financial responsibility," which includes the requirement of proof of ability to respond in damages for liability in the amount of $25,000 because of bodily injury or death of one person in any one accident, and $50,000 because of the bodily injury to or death of two or more persons in any one accident. Shelter's policy here, however, is exactly two times those minimum coverage requirements, and, therefore, would not be excess coverage by operation of the statute.[4] In any event, we have concluded earlier in this opinion that

---

4. Section 379.204 went into effect in August 28, 1999. The policy involved in this case was issued on July 2, 1999, and the accident in question occurred in November 1999. No issue is raised, and we express no opinion on whether Section 379.204 would otherwise be applicable here.

if the underinsured motorist coverage was applicable here, it would, pursuant to the policy provisions, apply as excess coverage, up to the policy limits, after deducting payments received from or on behalf of the tortfeasor. Plaintiff's argument that Shelter has, in effect, violated the public policy as codified in Section 379.204 is not supported by citation to any relevant authority, or accompanied by an explanation of why none is available. Under such circumstances, an appellate court is justified in considering the argument abandoned. *In re Marriage of Spears,* 995 S.W.2d 500, 503 (Mo.App. S.D.1999). We do so here.

Like *Rodriguez, Hinshaw, and Trapf,* we hold that Poe's vehicle did not meet the unambiguous definition of an "underin-sured motor vehicle" contained in Shelter's policy. Accordingly, Poe was not an "underinsured" motorist under Plaintiff's Shelter policy and that coverage was not applicable.

The judgment of the trial court is reversed.

MONTGOMERY, P.J., and BARNEY, J., concur.